## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ANGELA BURTON; NATASHA M. CASBY; BRIDGETTE QUINN; and SONDRA LOGGINS; on behalf of themselves and all others similarly situated, | ) ) ) ) | **Civil Action No._____** |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| vs. | ) | |
| | ) | |
| L'OREAL USA, INC.; L'OREAL USA PRODUCTS, INC.; and SOFTSHEEN-CARSON, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Angela Burton, Natasha M. Casby; Bridgette Quinn; Sondra Loggins; and Lakasirea Sherie Turner ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this Class Action Complaint ("CAC") against Defendants L'Oreal USA, Inc., L'Oreal USA Products, Inc., and Softsheen-Carson, Inc. ("Defendants"), and in support state the following:

## NATURE OF THE ACTION

1.       This is a class action lawsuit by Plaintiffs, and others similarly situated, who purchased Hair Straighteners and/or Relaxers manufactured, sold, and distributed by Defendants. Defendants distribute, market, and sell several over-the-counter hair straightener and/or relaxer products under their brand names, including "Dark & Lovely" ("Toxic Hair-Straightener(s) and/or Relaxer(s)"). Defendants' Toxic Hair-Straighteners and/or Relaxers (identified below) are adulterated with Endocrine Disrupting Chemicals ("EDC"). EDC's, including Di-2-ethylhexylphthalate ("DEP"), are known to increase a woman's risk of: harm and/or injury

1

including endometriosis, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[1]  The presence of EDCs in Defendants' Toxic Hair-Straightener was not disclosed in the products' label, in violation of state and federal law. Plaintiffs and the putative classes suffered economic damages due to Defendants' misconduct (as set forth below) and they seek injunctive relief and restitution for the full purchase price of the hair straighteners and/or relaxers product(s) they purchased. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and Plaintiffs are Citizens of States different from Defendants.

3.      This Court has jurisdiction over each Defendants because Defendants are authorized to conduct and do business in Michigan. Defendants have marketed, promoted, distributed, and sold Toxic Hair-Straighteners and/or Relaxers, including the Toxic Hair-Straightener and/or Relaxer Products identified below, in Michigan and Defendants have sufficient minimum contacts with this State and/or have sufficiently availed themselves of the markets in this State through promotion, sales, distribution, and marketing within this State to render the

---

[1]    *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C (last visited Oct. 28, 2022).

exercise of jurisdiction by this Court permissible.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred while she resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial business in this District.

## THE PARTIES

A.     **Plaintiffs**

5.     Plaintiff Angela Burton is a citizen and resident of Redford, Michigan and at all times relevant hereto, has been a resident of Wayne County. Ms. Burton purchased Dark & Lovely from Lee Beauty supply and Kroger stores in Wayne County. She paid approximately $9.00 for each of the hair straighteners and/or relaxers sold under the name Dark & Lovely. During that time, based on the false and misleading claims by Defendants, Ms. Burton was unaware that Defendants' Toxic Hair-Straighteners and/or Relaxers may be adulterated with EDCs. Ms. Burton purchased the Defendants' Toxic Hair-Straighteners and/or Relaxers on the assumption that the labeling of Defendants' Toxic Hair-Straighteners and/or Relaxers was accurate and that the products were unadulterated, safe, and effective. Ms. Williams would not have purchased Defendants' Toxic Hair-Straighteners and/or Relaxers had she known there was a risk the products may contain EDCs. As a result, Ms. Burton suffered injury in fact when she spent money to purchase products she would not otherwise have purchased absent Defendants' misconduct, as alleged herein.  However, Ms. Burton would be interested in purchasing similar hair care products in the future provided they are not adulterated.

6.     Plaintiff Natasha M. Casby is a citizen and resident of Slidell, Louisiana and at all times relevant hereto, has been a resident of St. Tammany Parish.  Ms. Casby purchased Dark &

Lovely from Kmart and Walmart stores in St. Tammany Parish. Louisiana. She paid anywhere from $5.00 to $8.00 for each of the hair straighteners and/or relaxers sold under the name Dark & Lovely. During that time, based on the false and misleading claims by Defendants, Ms. Casby was unaware that Defendants' Toxic Hair-Straighteners and/or Relaxers may be adulterated with EDCs. Ms. Casby purchased the Defendants' Toxic Hair-Straighteners and/or Relaxers on the assumption that the labeling of Defendants' Toxic Hair-Straighteners and/or Relaxers was accurate and that the products were unadulterated, safe, and effective. Ms. Casby would not have purchased Defendants' Toxic Hair-Straighteners and/or Relaxers had she known there was a risk the products may contain EDCs. As a result, Ms. Casby suffered injury in fact when she spent money to purchase products she would not otherwise have purchased absent Defendants' misconduct, as alleged herein. However, Ms. Casby would be interested in purchasing similar hair care products in the future provided they are not adulterated.

7.      Plaintiff Bridgette Quinn is a citizen and resident of Eupora, Mississippi, and at all times relevant hereto, has been a resident of Webster County. Ms. Quinn purchased Dark & Lovely from Fred's and Family Dollar stores in Webster County. She paid approximately $8.00 to $10.00 for each of the hair straighteners and/or relaxers sold under the name Dark & Lovely. During that time, based on the false and misleading claims by Defendants, Ms. Quinn was unaware that Defendants' Toxic Hair-Straighteners and/or Relaxers may be adulterated with EDCs. Ms. Quinn purchased the Defendants' Toxic Hair-Straighteners and/or Relaxers on the assumption that the labeling of Defendants' Toxic Hair-Straighteners and/or Relaxers was accurate and that the products were unadulterated, safe, and effective. Ms. Quinn would not have purchased Defendants' Toxic Hair-Straighteners and/or Relaxers had she known there was a risk the products may contain EDCs. As a result, Ms. Quinn suffered injury in fact when she spent money to

4

purchase products she would not otherwise have purchased absent Defendants' misconduct, as alleged herein. However, Ms. Quinn would be interested in purchasing similar hair care products in the future provided they are not adulterated.

8. Plaintiff Sondra Loggins is a citizen and resident of New Brunswick, New Jersey, and at all times relevant hereto, has been a resident of Middlesex County. Ms. Loggins purchased Dark & Lovely from Sally Beauty stores in Middlesex County. She paid anywhere from $7.99 to $8.99 for each of the hair straighteners and/or relaxers sold under the name Dark & Lovely and Optimum Extra Mild Strength. During that time, based on the false and misleading claims by Defendants, Ms. Loggins was unaware that Defendants' Toxic Hair-Straighteners and/or Relaxers may be adulterated with EDCs. Ms. Loggins purchased the Defendants' Toxic Hair-Straighteners and/or Relaxers on the assumption that the labeling of Defendants' Toxic Hair-Straighteners and/or Relaxers was accurate and that the products were unadulterated, safe, and effective. Ms. Loggins would not have purchased Defendants' Toxic Hair-Straighteners and/or Relaxers had she known there was a risk the products may contain EDCs. As a result, Ms. Loggins suffered injury in fact when she spent money to purchase products she would not otherwise have purchased absent Defendants' misconduct, as alleged herein. However, Ms. Loggins would be interested in purchasing similar hair care products in the future provided they are not adulterated.

**B.** <u>**Defendants**</u>

9. Defendant L'Oreal USA, Inc. is a Delaware corporation with its principal places of business located at 10 Hudson Yards, New York, New York 10001 and 888 N Douglas St., El Segundo, California 90245. L'Oreal USA, Inc. manufactures, markets, advertises, labels, distributes, and sells the Toxic Hair-Straighteners and/or Relaxers at issue in this litigation.

10. Defendant L'Oreal USA Products, Inc. is a Delaware corporation with its principal

place of business located at 10 Hudson Yards, New York, New York 10001. L'Oreal USA Products, Inc. manufactures, markets, advertises, labels, distributes, and sells the Toxic Hair-Straighteners and/or Relaxers at issue in this litigation.

11. Upon information and belief, Defendant Softsheen-Carson, Inc. is a Delaware corporation with its principal place of business located at 10 Hudson Yards, New York, New York.[2] Softsheen-Carson, Inc. is a wholly-owned subsidiary of Defendant L'Oreal USA, Inc. and is, for all intents and purposes, a brand that is managed by Defendant L'Oreal USA, Inc. (*i.e.*, it is a part of the consumer products division within L'Oreal USA, Inc.). Softsheen-Carson, Inc. manufactures, markets, advertises, labels, distributes, and sells the Toxic Hair-Straighteners and/or Relaxers at issue in this litigation.

12. Defendants manufacture, market, advertise, label, distribute, and sell a variety of hair straighteners and/or relaxers, including but not limited to:

| 1 | Dark & Lovely | Relaxer | Triple Nourished Silkening Relaxer No-Lye |
|---|---|---|---|
| 2 | Dark & Lovely | Relaxer | Healthy Gloss 5 Shade Shea Moisture No-Lye Relaxer |
| 3 | Dark & Lovely | Relaxer | No-Lye Conditioning Relaxer System |
| 4 | Dark & Lovely | Relaxer | Healthy Gloss 5 Moisturizing No-Lye Relaxer with Shea Butter |
| 5 | Dark & Lovely | Relaxer | Superior Moisture Plus No-Lye Relaxer Kit |
| 6 | Dark & Lovely | Relaxer | Moisture Plus No-Lye Relaxer |
| 7 | Optimum Smooth | Relaxer | Professional multi-mineral reduced PH Crème Relaxer |

---

[2] Upon information and belief, Defendant Softsheen-Carson, Inc.'s previous principal place of business was located in Chicago, IL; however, as of approximately 2004, Defendant L'Oreal USA, Inc. moved the Softsheen-Carson division from Chicago to New York.

## FACTUAL ALLEGATIONS

### C.     Hair Straighteners and Relaxers

13.     Hair straighteners and/or relaxers, typically creams, lotions, and/or oils, are marketed to women to make their hair smoother, straighter, and easier to manage on a daily basis.

14.     Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in cities throughout the United States.

15.     Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

16.     The toxic chemicals in hair relaxers are absorbed and metabolized through direct skin contact.  Moreover, hair relaxers can, and often do, cause burns and lesions in the scalp, further facilitating entry of hair relaxer constituents into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

17.     In some studies, up to 90% of black and brown women have used hair relaxants

and straighteners, which is more commonplace for these women than for any other race.

18.     Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, that are not listed separately as ingredients but, instead, are often broadly lumped into the "fragrance" or "perfume" categories.

19.     Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[3]

20.     In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[4]  It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

21.     Once relaxer use begins in childhood, it usually becomes a lifetime habit. The duration and frequency of use of these products increases the risk of permanent and debilitating diseases associated with long-term exposure to EDC.

**D.      Regulatory Framework**

22.     The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

23.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded"

---

[3] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[4] Dana Oliver, The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads, HuffPost, Feb., 1, 2014.  https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981  (last visited Oct. 27, 2022).

cosmetics in interstate commerce.

24.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

25.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user and 2) its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

26.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

27.     Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading; 2) the label does not include all required information; 3) required information is not prominent and conspicuous; and 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[5]

28.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[6] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[7]

29.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry.[8] The FDA revoked authorizations for the food contact

---

[5] Food and Drug Administration Cosmetic Act § 602 (1938).
[6] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics (last visited Oct. 27, 2022).
[7] 21 Code of Federal Regulations § 700.19.
[8] § 87 FR 31080.

use of twenty-three phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[9]

30.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

31.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (1) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic; and (2) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[10]

32.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces

33.     Except for color additives and ingredients prohibited or restricted by regulation, a

---

[9] *Phthalates in Food Packages and Food Contact Applications*, U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications (last visited Oct. 27, 2022).

[10] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last visited Oct. 27, 2022).

manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use; (2) the product is properly labeled; and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[11]

34.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product **shall** bear a warning statement whenever necessary or appropriate to prevent a health hazard that **may** be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

35.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

**E.    Endocrine-Disrupting Chemicals**

36.    The endocrine system is indispensable for life and influences nearly every cell, organ, and processes within the body.[12] The endocrine system regulates all biological processes in

---

[11] *Id.*

[12] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system. (last visited Oct. 28, 2022).

the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[13]

37.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[14]

38.     Hormones, such as estrogen, testosterone, progesterone, and other androgens, are chemical signals that control or regulate critical biological processes.[15]

39.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[16]

40.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[17]

41.     EDCs are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

42.     EDC's can act directly on hormone receptors as mimics or antagonists, or on

---

[13] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system. (last visited Oct. 28, 2022).
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification, Nature Reviews Endocrinol*, Nov. 12, 2019, https://www.nature.com/articles/s41574-019-0273-8 (last visited Oct. 28, 2022).

proteins that control hormone delivery.[18]

43.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

44.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

45.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

46.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[19]

47.     EDCs are known to cause to numerous adverse human health outcomes, including but not limited to: endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[20]

48.     EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with increased risks

---

[18] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/ (last visited Oct. 28, 2022).
[19] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub (last visited Oct. 28, 2022).
[20] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C (last visited Oct. 28, 2022).

of breast cancer, uterine cancer, ovarian and other types of hormone-sensitive cancers. A woman's lifetime risk of developing these hormone-sensitive cancers increases with greater duration and cumulative exposure.

49.     Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

50.     Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[21]

a.     Phthalates

51.     Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

52.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

53.     At all relevant times herein, phthalates were used in Defendants' products.

54.     Phthalates are chemicals used to improve the stability and retention of fragrances

---

[21] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/ (last visited Oct. 28, 2022).

and to help topical products stick to and penetrate skin and hair.[22]

55.     Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[23]

56.     Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

57.     Phthalates can be found in most products that have contact with plastics during producing, packaging, or delivering. Despite their short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[24]

58.     Phthalates are a series of chemical substances and compounds, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[25]

59.     Defendants' products referenced herein contain phthalates, including Di-2-ethylhexylphthalate.

60.     Under the authority of the FPLA, the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers. However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients meaning phthalates

---

[22] Olivia Koski & Sheila Hu, *Fighting Phthalates*, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates (last visited Oct. 28, 2022).
[23] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/ (last visited Oct. 28, 2022).
[24] *Id.*
[25] *Id.*

evade listing when combined with a fragrance. As a result, consumers, including Plaintiffs were not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiffs and placed into the stream of commerce by Defendants.

61.     Since 1999, the Centers for Disease Control ("CDC") have found phthalates in individuals studied for chemical exposure.[26]

b.     Di-2-ethylhexylphthalate

62.     Di-2-ethylhexylphthalate (DEHP)[27] is a highly toxic manufactured chemical[28] that is not found naturally in the environment.[29]

63.     DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[30]

64.     DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure. [31]

65.     Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure

---

[26] Biomarker Groups, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf (last visited Oct. 28, 2022).
[27] Also known as Bis(2-ethylhexyl) phthalate.
[28] Sai Rowdhwal & Jiaxiang Chen, Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview, Biomed Research International, Feb., 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites (last visited Oct. 28, 2022).
[29] Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP), U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm) (last visited Oct. 28, 2022).
[30] Pinar Erkekoglu & Belma Kocer-Gumusel, Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234 (last visited Oct. 28, 2022).
[31] Katelyn H. Wong & Timur Durrani, Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub (last visited Oct. 28, 2022).

for their lifetimes, including intrauterine life.[32]

66.     The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 μg/kg/day.[33]

67.     The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake (TDI) is 48 μg/kg bodyweight.[34]

68.     When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl) phthalate (MEOHP).[35]

69.     DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to, endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[36] various cancers, and metabolic syndrome within the human

---

[32] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/ (last visited Oct. 28, 2022).

[33] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356 (last visited Oct. 28, 2022).

[34] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/ (last visited Oct. 28, 2022).

[35] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/ (last visited Oct. 28, 2022); Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)) (last visited Oct. 28, 2022).

[36] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/ (last visited Oct. 28, 2022).

population and their future children.[37]

70.    Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[38]

71.    The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

a.    **Reproductive effects.** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b.    **Developmental effects**. Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

---

[37] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/ (last visited Oct. 28, 2022).
[38] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf (last visited Oct. 28, 2022).

72.     The global consumption of DEHP was estimated at 3.07 million tons (Global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[39]

73.     Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[40]

74.     Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[41]

75.     When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[42]

76.     Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[43]

## F.     **Defendants' Marketing Efforts**

77.     The manufacture of any misbranded or adulterated drug is prohibited under federal law[44] and state law, as described herein.

---

[39] *Id.*

[40] *Id.*

[41] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w (last visited Oct. 28, 2022).

[42] *Id.*

[43] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf (last visited Oct. 28, 2022).

[44] 21 U.S.C. §331(g).

78. The introduction into commerce of any misbranded or adulterated drug is similarly prohibited.[45]

79. The receipt in interstate commerce of any adulterated or misbranded drug is also unlawful.[46]

80. Among the ways a drug may be adulterated are:

If it consists in whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it may have been rendered injurious to health; . . . .[47]

81. A drug is misbranded:

(a) "If its labeling is false or misleading in any particular."[48]

(b) If the labeling does not contain, among other things, "the proportion of each active ingredient[.]"[49]

(d) "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[50]

82. If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[51]

83. Because Defendants did not disclose EDCs may be present in the Toxic Hair-Straightener and/or Relaxers purchased by Plaintiffs and the putative class members, their Toxic Hair-Straightener and/or Relaxers are adulterated and misbranded. There is no "no safe level of EDCs" exposure, so it is unsuitable for human application as an ingredient in hair straighteners

---

[45] 21 U.S.C. §331(a).
[46] 21 U.S.C. §331(c).
[47] 21 U.S.C. §351(a)(2)(B).
[48] 21 U.S.C. §352(a)(1).
[49] 21 U.S.C. §352(e)(1)(A)(ii).
[50] 21 U.S.C. §352(j).
[51] 21 C.F.R. §§201.6. "The labeling of a drug may be misleading by reason (among other reasons) of: … (2) Failure to reveal the proportion of, or other fact with respect to, an ingredient present in such drug, when such proportion or other fact is material in the light of the representation that such ingredient is present in such drug." 21 C.F.R. §201.10(2).

and/or relaxers.

84.    Defendants wrongfully advertised and sold the Toxic Hair-Straightener and/or Relaxers without any labeling to indicate to consumers that these products may contain EDCs. The following images provide an example:







85.     Plaintiffs have standing to represent members of the putative class because there is sufficient similarity between the specific Toxic Hair-Straightener and/or Relaxers purchased by the Plaintiffs and the other Toxic Hair-Straightener and/or Relaxers not purchased by Plaintiffs. Specifically, each and every one of Defendants' Toxic Hair-Straightener and/or Relaxers (i) are marketed in substantially the same way – as "Hair straighteners and/or relaxers"— and (ii) fail to include labeling indicating to consumers that the Toxic Hair-Straightener and/or Relaxers may contain EDCs as an active or inactive ingredient. Accordingly, the misleading effect of all of the Toxic Hair-Straightener and/or Relaxers are substantially the same.

## CLASS ALLEGATIONS

86.     Plaintiffs bring this action on behalf of themselves and all other similarly situated class members (the "Class" or "Classes") pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class and/or Sub-Classes against

22

Defendants for violations of Michigan state laws and/or similar laws in other states:

**Nationwide Class**

All consumers who purchased any Hair Straighteners and/or Relaxers Product in the United States of America and its territories (excluding California) from November 8, 2016, to the present for personal use or consumption.

Excluded from the Class are any Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

87. In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Classes:

**Michigan Sub-Class**

All consumers who purchased any of Defendants' Hair Straighteners and/or Relaxers Product in the State of Michigan from November 8, 2016, to the present for personal use or consumption.

Excluded from the Class are any Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

**Louisiana Sub-Class**

All consumers who purchased any of Defendants' Hair Straighteners and/or Relaxers Product in the State of Louisiana from November 8, 2021, to the present for personal use or consumption.

Excluded from the Class are any Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

**Mississippi Sub-Class**

All consumers who purchased any Hair Straighteners and/or Relaxers Product in the State of Mississippi from November 8, 2016, to the present for personal use or consumption.

Excluded from the Class are any Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

### New Jersey Sub-Class

All consumers who purchased any Hair Straighteners and/or Relaxers Product in the State of New York from November 8, 2016, to the present for personal use or consumption.

Excluded from the Class are any Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

88. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believes that the proposed Class/Sub-Classes contains thousands of purchasers of Defendants' Toxic Hair-Straightener and/or Relaxers who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs at this time.

89. Plaintiffs' claims are typical to those of all Class members because members of the Class are similarly injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive hair straighteners and/or relaxers claims that accompanied each and every hair straighteners and/or relaxers product in the collection. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class/Sub-Class.

90. Plaintiffs' claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The

claims of Plaintiffs and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

(a)  whether Defendants' Toxic Hair-Straightener and/or Relaxers contained EDCs;

(b)  whether Defendants' omissions are true, or are misleading, or objectively reasonably likely to deceive.

(c)  whether the alleged conduct constitutes violations of the laws asserted;

(d)  whether Defendants' alleged conduct violates public policy;

(e)  whether Defendants' engaged in false or misleading advertising;

(f)  whether Defendants were unjustly enriched as a result of its labeling, marketing, advertising and/or selling of the Toxic Hair-Straightener and/or Relaxers;

(g)  whether Plaintiffs and the Class members are entitled to damages and/or restitution and the proper measure of that loss; and

(h)  whether an injunction is necessary to prevent Defendants from continuing to market and sell defective and adulterated Toxic Hair-Straightener and/or Relaxers that contain EDCs.

91.    Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the class. Plaintiffs have retained counsel experienced in complex litigation and class actions. Plaintiffs' counsel has successfully litigated other class action cases similar to that here and have the resources and abilities to fully litigate and protect the interests of the class. Plaintiffs intend to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

92.    A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the

Plaintiffs and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain meaningful and effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

93.     The Class also may be certified because Defendants have acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

94.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described above, such as continuing to market and sell Toxic Hair-Straightener and/or Relaxers that may be adulterated with EDCs, and requiring Defendants to provide a full refund of the purchase price of the Toxic Hair-Straightener and/or Relaxers to Plaintiffs and Class members.

95.     Unless a Class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiffs and the Class members. Unless a Class-wide injunction is issued, Defendants will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled. Indeed, to this day, Defendant continues to market and sell Toxic Hair-Straightener and/or Relaxers to be adulterated with EDCs.

## TOLLING OF THE STATUTE OF LIMITATIONS,
## FRAUDULENT CONCEALMENT, EQUITABLE TOLLING,

## AND CONTINUING VIOLATIONS

96.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the claims sued upon herein until immediately prior to commencing this civil action.

97.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

98.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Sub Classes assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

99.     Defendants continue to engage in the deceptive practice, and, consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct.  Therefore, Plaintiffs and the Sub Classes submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of any Class purchased Defendants' Toxic Hair-Straighteners and/or Relaxers constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

100.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

101.     Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and actively have foreclosed Plaintiffs and the Classes from learning of their illegal, unfair, and/or deceptive acts.

102.     By reason of the foregoing, the claims of Plaintiffs and the Classes are timely under

any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## **FIRST CAUSE OF ACTION**

## **MEDICAL MONITORING**

### **(On Behalf of the New Jersey Plaintiff and Sub-Class Members)**

103.     Defendants provided misinformation about the presence of EDCs in their Toxic Hair-Straighteners and/or Relaxers which are harmful to women's health as described herein and, as a result, Defendants succeeded in persuading large segments of the relevant consumer market to purchase Defendants' Toxic Hair-Straighteners and/or Relaxers despite the presence of significant dangers, as set forth herein.

104.     Defendants had a pre-marketing, post-manufacturing and continuing duty to warn, which arose when Defendants knew, or with reasonable care should have known, that Defendants' Toxic Hair-Straighteners and/or Relaxers were injurious or fatal.

105.     Defendants omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Defendants' Toxic Hair-Straighteners and/or Relaxers, including but not limited to the risks of death, disease, and other health problems associated with the use of Defendant's Toxic Hair-Straighteners and/or Relaxers.  Defendants failed to disclose that Defendants' Toxic Hair-Straighteners and/or Relaxers contained toxic chemicals, including EDCs and/or purposely downplayed and/or understated the serious nature of the risks associated with the use of Defendants' Toxic Hair-Straighteners and/or Relaxers and instead encouraged the use of Defendants' Toxic Hair-Straighteners and/or Relaxers despite knowledge of the dangerous side effects that these products present to the consuming population.

106.     Defendants falsely and deceptively misrepresented or knowingly omitted,

suppressed or concealed material facts regarding the ingredients contained within Defendants'
Toxic Hair-Straighteners and/or Relaxers and the risk posed by those ingredients to the public.

107.    Had the New Jersey Plaintiff known that Defendants' Toxic Hair-Straighteners
and/or Relaxers contained the dangerous ingredients described herein and/or that those ingredients
could cause serious life-threatening injuries, none of them would not have purchased Defendants'
Toxic Hair-Straighteners and/or Relaxers.

108.    Defendants knew or should have known, and would have known had appropriate
testing been done, that the use of Defendants' Toxic Hair-Straighteners and/or Relaxers caused the
serious and potentially life-threatening adverse health consequences and/or death as described
herein.

109.    Defendants' actions as set forth herein constitute knowing omission, suppression
or concealment of material facts, made with the intent that others will rely upon such concealment,
suppression or omission, in connection with the marketing of Defendants' Toxic Hair-
Straighteners and/or Relaxers.

110.    Defendants' actions as described herein evidence lack of good faith, honesty in fact
and observance of fair dealing so as to constitute unconscionable commercial practices.

111.    The New Jersey Plaintiff has suffered ascertainable loss – such as economic losses
that include the purchase price of the drug, the out-of-pocket cost of interim medical tests and
services and other costs incidental to their use of a harmful and defective product -- for which
Defendants are liable to the New Jersey Plaintiff.

112.    As a proximate result of consuming Defendants' Toxic Hair-Straighteners and/or
Relaxers, the New Jersey Plaintiff has been significantly exposed to toxic chemicals and thereby
have suffered an increased risk of disease and/or injury, making the periodic examination of the

New Jersey Plaintiff both reasonable and medically necessary.

113. There currently exists a means to detect the onset of disease and/or injury, as well as the other adverse health problems caused by the use of Defendants' Toxic Hair-Straighteners and/or Relaxers, at an early stage, such that subsequent treatment would have a higher chance of success at prolonging life and reducing suffering than would exist without such monitoring and treatment.

114. The prescribed monitoring regime is different from that normally recommended in the absence of the exposure to this drug and is reasonably necessary according to contemporary medical and scientific principles.

115. The increased susceptibility to injuries and irreparable threat to the health of the New Jersey Plaintiff resulting from their exposure to this hazardous substance can only be mitigated or redressed by the Defendant's providing, and/or compensating the New Jersey Plaintiff for the costs of, medical monitoring for cancer and cancer-related conditions, necessary as a result of the use of Defendants' Toxic Hair-Straighteners and/or Relaxers.

116. As a result of Defendants' marketing of its Toxic Hair-Straighteners and/or Relaxers and Plaintiffs' use thereof, the New Jersey Plaintiff is entitled to appropriate medical monitoring funded by Defendants, including but not limited to, testing and preventative screening.

117. The foregoing wrongful, tortious, and negligent acts, omissions, and conduct by Defendants constitute actionable negligence.

118. Defendants' negligent, tortuous, and wrongful acts are a proximate cause of the New Jersey Plaintiff's suffering an increased risk of serious injury and disease, which they will continue to suffer. The New Jersey Plaintiff has been exposed to a hazardous product and suffers a significantly increased risk of contracting serious injury and even death. This increased risk

makes periodic diagnostic and medical examinations reasonable and necessary.

119.     Medical monitoring is particularly appropriate, and, indeed, imperative, with respect to this action as:

     a.    Defendants' Toxic Hair-Straighteners and/or Relaxers have been found to cause cancer, including breast, uterine and other hormone-driven cancers and diseases.

     b.    It is reasonably believed that the injury and damage caused by Defendants' Toxic Hair-Straighteners and/or Relaxers may be latent, asymptomatic, chronic, and/or undiscovered in the absence of medical monitoring for these cancers.

120.     Early detection and diagnosis of these diseases is clinically invaluable since it can prevent, reduce and/or significantly delay resulting discomfort, suffering, and/or death and since these conditions can be often asymptomatic absent proper testing.

121.     Easily administered, cost-effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.  Early diagnosis of diseases and conditions will allow prompt and effective treatment which will reduce the risk of morbidity and mortality which these patients would suffer if treatment were delayed until their condition became overly symptomatic.

122.     Appropriate tests include non-invasive, readily available initial tests and procedures.

123.     The increased susceptibility to injuries and irreparable threat to the health of the New Jersey Plaintiff resulting from their exposure to Defendants' Toxic Hair-Straighteners and/or Relaxers can only be mitigated or addressed by appropriate medical testing.

124.     By reason of the foregoing, Defendants are liable to the New Jersey Plaintiff for the costs of periodic medical monitoring.

125.     Wherefore, the New Jersey Plaintiff requests damages in the form of costs for appropriate medical monitoring as requested in the Prayer for Relief below.

## SECOND CAUSE OF ACTION

### Violation of Michigan's Consumer Protection Act

### Mich. Comp. Laws §§ 445.901-922

### (On Behalf of Plaintiff Angela Burton and the Michigan Sub-Class)

126.     Plaintiff Angela Burton incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

127.     Plaintiff Angela Burton brings this Count individually and on behalf of the Michigan Sub-Class.

128.     The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.…" Mich. Comp. Laws § 445.903(1). GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

129.     Defendants have violated and continues to violate Michigan Consumer Protection Act by, among other things, (1) misrepresenting that its Toxic Hair Straighteners and/or Relaxers were safe when in fact its Toxic Hair Straighteners and/or Relaxers are unsafe because they contain EDCs, (2) failing to disclose to consumers in its labeling or otherwise that its Toxic Hair Straighteners and/or Relaxers contained EDCs, and (3) continuing to market, advertise and sell Toxic Hair-Straightener and/or Relaxers adulterated with EDCs.

130.     Defendant engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, with respect to the sale and advertisement of its Toxic Hair Straighteners and/or Relaxers in violation of Mich. Comp. Laws § 445.903, including by misrepresenting the true quality of its Toxic Hair Straighteners and/or Relaxers, and concealing the true risks of its Toxic Hair Straighteners and/or Relaxers

131.     Defendants knew, or through the exercise of reasonable care, should have known, that its Toxic Hair Straighteners and/or Relaxers were adulterated with EDCs. Defendants' unfair conduct, as described herein, is intentional, and Defendants intend for consumers to rely on its unfair and misleading practices, including with respect to Defendants' decision to continue to sell Toxic Hair-Straightener and/or Relaxers containing EDCs.

132.     Additionally, Defendants made deceptive statements and omissions regarding the Toxic Hair-Straightener and/or Relaxers.  Defendants represented that the Toxic Hair-Straightener and/or Relaxers were safe when they are not because they are adulterated with EDCs. And, Defendants did not disclose that the Toxic Hair-Straightener and/or Relaxers contain EDCs when they do.

133.     Plaintiff Angela Burton and the members of the Michigan Sub-Class were deceived by Defendant's claims that, *inter alia*, its Toxic Hair Straighteners and/or Relaxers were safe when

in fact the product is unsafe because it contains a cancer-causing chemical not identified on the label.

134.    The above unfair and deceptive practices and acts by Defendant were material misrepresentations of a presently existing or past fact.

135.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

136.    Plaintiff Angela Burton and the members of the Michigan Sub-Class relied on Defendant's representations in that they would not have purchased, chosen, and/or paid for all or part of Defendant's Toxic Hair Straighteners and/or Relaxers had they known that the Toxic Hair Straighteners and/or Relaxers were defective.

137.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Angela Burton and the members of the Michigan Sub-Class suffered an ascertainable loss of money or property, as described above.

138.    Plaintiff Angela Burton and the members of the Michigan Sub-Class seek relief under Mich. Comp. Laws § 445.911, including, but not limited to injunctive relief, damages, attorneys' fees and costs

### THIRD CAUSE OF ACTION

**Violation of New Jersey's General Business Law**

**New Jersey Unfair Trade Practices Law § 56:8**

**(On Behalf of Plaintiff Sondra Loggins and the New Jersey Sub-Class)**

139.    Plaintiff Sondra Loggins incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

140.    Plaintiff Sondra Loggins brings this Count individually and on behalf of the New

Jersey Sub-Class.

141.    Defendants are "persons" under New Jersey § 56:8-1.

142.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce under New Jersey law.

143.    New Jersey law states: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in  connection with the sale or advertisement of any merchandise or real estate, or  with the subsequent performance of such person as aforesaid, whether or not any  person has in fact been misled, deceived or damaged thereby, is declared to be  an unlawful practice." N.J. Stat. § 56.8-2. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

144.    In the course of business, Defendants violated New Jersey law by making false or misleading statements on Toxic Hair-Straightener and/or Relaxers by not disclosing that the Toxic Hair-Straightener and/or Relaxers contained EDCs.

145.    In the course of business, Defendants made affirmative misrepresentations that conveyed to Plaintiff Sondra Loggins and the New Jersey Sub-Class members that the Toxic Hair-Straightener and/or Relaxers were safe and suitable as hair straighteners and/or relaxers. Defendants, however, concealed and suppressed material facts concerning the Toxic Hair-Straightener and/or Relaxers, including that the Toxic Hair-Straightener and/or Relaxers were unsafe and unsuitable as hair straighteners and/or relaxers and that they contained EDCs.

146.    Plaintiff Sondra Loggins and New Jersey Sub-Class members had no way of discerning that Defendants' representations were false and misleading because the labeling did not

35

disclose the presence of EDCs, and the Sub-Class members had no reason to otherwise suspect the Toxic Hair-Straightener and/or Relaxers were adulterated with EDCs.

147.    Defendants thus violated New Jersey law by making statements, when considered as a whole from the perspective of the reasonable consumer, that conveyed that the Toxic Hair-Straightener and/or Relaxers were safe and suitable as hair straighteners and/or relaxers.

148.    Defendants made affirmative misrepresentations about the safety, quality, and ingredients of its Toxic Hair-Straightener and/or Relaxers that were not true, and they failed to disclose material facts regarding the Toxic Hair-Straightener and/or Relaxers which mislead Plaintiff Sondra Loggins and New Jersey Sub-Class members.

149.    Defendants knew or should have known that their conduct violated New Jersey law.

150.    Defendant owed Plaintiff Sondra Loggins and the New Jersey Sub-Class a duty to disclose the true and unsafe nature of the Toxic Hair-Straightener and/or Relaxers.

151.    Defendants' concealment of the true characteristics of the Toxic Hair-Straightener and/or Relaxers was material to Plaintiff Sondra Loggins and New Jersey Sub-Class members.

152.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Sondra Loggins and New Jersey Sub-Class members, about the true nature of the Toxic Hair-Straightener and/or Relaxers.

153.    Plaintiff Sondra Loggins and New Jersey Sub-Class members would not have purchased the Toxic Hair-Straightener and/or Relaxers had they known that the Toxic Hair-Straightener and/or Relaxers contain EDCs.

154.    Defendants' violations present a continuing risk to Plaintiff Sondra Loggins and the New Jersey Sub-Class as well as to the general public, including public health. Thus, Defendants' unlawful acts and practices complained of herein affect the public interest.

155. Plaintiff Sondra Loggins and the New Jersey Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants have an ongoing duty to all customers and the public to refrain from unfair and deceptive practices under the New Jersey law. Plaintiff Sondra Loggins and all New Jersey Sub-Class members suffered ascertainable loss because of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

156. As a direct and proximate result of Defendants' violations of New Jersey law, Plaintiff Sondra Loggins and New Jersey Sub-Class members have suffered injury-in-fact and/or actual damage.

157. As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiff Sondra Loggins and the New Jersey Sub-Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to "refund of all moneys acquired by means of any practice declared . . . to be unlawful." N.J. Stat. § 56:8-2.11.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of the Multi-State Class and All State Classes)

158. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

159. As a result of Defendants' wrongful and deceptive conduct alleged herein, Defendant knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiffs and members of the Classes when they purchased the Toxic Hair-Straightener and/or Relaxers.

160.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

161.    As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

162.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

163.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from the false and deceptive labeling and marketing of the Toxic Hair-Straightener and/or Relaxers to Plaintiffs and members of the Classes.

164.    Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

165.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and members of the Classes.

166.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.

167.    Finally, Plaintiffs and members of the Classes may assert an unjust enrichment claim even though a remedy at law may otherwise exist.[52]

---

[52] *See Lewis v. Lead Indus. Ass'n, Inc.*, 793 N.E.2d 869, 877 (Ill. App. Ct. 2003) (citing *Board of Education of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580 (1989)) ("To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege facts supporting the conclusion that the defendant unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates the principles of justice, equity, and good conscience. . . . In order for a cause of action for unjust enrichment to exist, there must be some independent basis which establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty.").

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation/Omission**

**(On Behalf of the Multi-State Class and All State Classes)**

168.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

169.     Through their labeling and advertising, Defendants made representations to the Plaintiffs and the Class members concerning the active and inactive ingredients in their Toxic Hair-Straightener and/or Relaxers.

170.     Defendants have a duty to provide accurate information to consumers with respect to the ingredients identified in their Toxic Hair-Straightener and/or Relaxers as detailed above.

171.     Defendants failed to fulfill their duty to accurately disclose in their labeling and advertising that the Toxic Hair-Straightener and/or Relaxers contained EDCs.

172.     Additionally, Defendants have a duty to not make false representations with respect to their Toxic Hair-Straightener and/or Relaxers.

173.     Defendants failed to fulfill its duty when they made false representations regarding the quality and safety of their Toxic Hair-Straightener and/or Relaxers as detailed above.

174.     Such failures to disclose on the part of Defendants amount to negligent omission and the representations regarding the quality and safety of the product amount to negligent misrepresentation.

175.     Plaintiffs and the other members of the Classes reasonably relied upon such representations and omissions to their detriment.

176.     By reason thereof, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Breach of Express Warranty

### (On Behalf of the Multi-State Class and All State Classes)

177.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

178.    As detailed above, Defendants, through their written literature, packaging and labeling, and written and media advertisement, expressly warranted that the Toxic Hair-Straightener and/or Relaxers were safe and fit for the purposes intended, that they were of merchantable quality, and that they did not pose dangerous health risks.

179.    Moreover, the Toxic Hair-Straightener and/or Relaxers' labeling represents that the regular use of broad spectrum hair straighteners and/or relaxers is "protective" and that its use can "decrease the risk" of skin cancer and early skin aging. Such statements constitute an affirmation of fact or promise or a description of the product as being safe and not posing a dangerous health risk. Defendants breached this express warranty because their Toxic Hair-Straightener and/or Relaxers are not safe. To the contrary, the Toxic Hair-Straightener and/or Relaxers pose a dangerous health risk because they contain EDCs—a chemical that actually increases the risk of cancer when exposure occurs either through inhalation or skin absorption.

180.    Plaintiffs and the other Class members read and relied on these express warranties provided by Defendant in the packaging and written advertisements.

181.    Defendants breached its express warranties because the Toxic Hair-Straightener and/or Relaxers are defective and not reasonably safe for their intended use.

182.    Defendants knew or should have known that the Toxic Hair-Straightener and/or Relaxers did not conform to their express warranties and representations and that, in fact, the Toxic

Hair-Straightener and/or Relaxers are not safe and pose serious health risks because they contain EDCs.

183.    Plaintiffs and the other Class members have suffered harm on account of Defendants' breach of its express warranty regarding the fitness for use and safety of the Toxic Hair-Straightener and/or Relaxers and are entitled to damages to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Warranty

### (On Behalf of the Multi-State Class and All State Classes)

184.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

185.    Because the Toxic Hair-Straightener and/or Relaxers contained EDCs, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Toxic Hair-Straightener and/or Relaxers are used.

186.    Plaintiffs and members of the Classes purchased the Toxic Hair-Straightener and/or Relaxers in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

187.    The Toxic Hair-Straightener and/or Relaxers were not altered by Plaintiffs or members of the Classes.

188.    Plaintiffs and members of the Classes were foreseeable users of the Toxic Hair-Straightener and/or Relaxers.

189.    Plaintiffs and members of the Classes used the Toxic Hair-Straightener and/or Relaxers in the manner intended.

190.    As alleged, the Toxic Hair-Straightener and/or Relaxers were not adequately

labeled and did not disclose that they contain EDCs.

191.    The Toxic Hair-Straightener and/or Relaxers did not measure up to the promises or facts stated in the written literature, media advertisement and communications by and from Defendants.

192.    Defendants impliedly warranted that the Toxic Hair-Straightener and/or Relaxers were merchantable, fit and safe for ordinary use.

193.    Defendants further impliedly warranted that the Toxic Hair-Straightener and/or Relaxers were fit for the particular purposes for which they were intended and sold.

194.    Contrary to these implied warranties, the Toxic Hair-Straightener and/or Relaxers were defective, unmerchantable, and unfit for their ordinary use when sold, and unfit for the particular purpose for which they were sold.

195.    By reason thereof, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Strict Product Liability – Failure to Warn

### (On Behalf of the Multi-State Class and All State Classes)

196.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

197.    Defendants knew or should have known that their Toxic Hair-Straightener and/or Relaxers contained EDCs, which is a known carcinogen.

198.    Defendants had a duty to warn Plaintiffs and the other Class members about the presence of EDCs in their Toxic Hair-Straightener and/or Relaxers.

199.     In addition, Defendants had a duty to warn Plaintiffs and the other Class members

about the dangers of the presence of EDCs in their Toxic Hair-Straightener and/or Relaxers.

200.   Defendants knew that the risk of exposure to EDCs from use of its products was not readily recognizable to an ordinary consumer and that consumers would not inspect the product for EDCs content.

201.   Defendants did not warn Plaintiffs and the other Class members that the Toxic Hair-Straightener and/or Relaxers contain EDCs or about the dangers of the presence of EDCs in their Toxic Hair-Straightener and/or Relaxers.

202.   Plaintiffs and the other Class members suffered damages by purchasing Toxic Hair-Straightener and/or Relaxers in a manner promoted by Defendants, and in a manner that was reasonably foreseeable by Defendants, because EDCs is a known carcinogen that is absorbed through inhalation and through the skin. Plaintiffs and the members of the Classes would not have purchased Defendants' Toxic Hair-Straightener and/or Relaxers had they known they contained EDCs.

203.    Plaintiffs and the other Class members were justified in their reliance on Defendants' labeling and advertising of the product for use as hair straighteners and/or relaxers.

204.   Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### Strict Product Liability – Manufacturing Defect

### (On Behalf of the Multi-State Class and All State Classes)

205.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

206.   The Toxic Hair-Straightener and/or Relaxers contained a manufacturing defect

when they left the possession of Defendants. Specifically, the Toxic Hair-Straightener and/or Relaxers differ from Defendants' intended result or from other lots of the same product line because they contain EDCs.

207.    Plaintiffs and the other Class members used the Toxic Hair-Straightener and/or Relaxers in a way that was reasonably foreseeable to Defendants.

208.    As a result of the defects in the manufacture of the Toxic Hair-Straightener and/or Relaxers, Plaintiffs and the other Class members suffered damages.

209.    Accordingly, Plaintiffs and members of the Classes suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class/Sub-Classes, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Toxic Hair-Straighteners and/or Relaxers;

C.    An order enjoining Defendants from suggesting or implying that the Toxic Hair Straighteners and/or Relaxers are safe and effective for human application;

D.    An order for payment by Defendants for appropriate medical monitoring needed by the Michigan and New Jersey Plaintiffs resulting from consumption of Toxic Hair-Straighteners and/or Relaxers

E.    An order requiring Defendants to engage in a corrective advertising campaign and

44

engage in any further necessary affirmative injunctive relief, such as recalling existing Toxic Hair-Straighteners and/or Relaxers;

F.       An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

G.       An order requiring Defendants to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

H.       An order requiring Defendants to disgorge any ill-gotten benefits received from Plaintiff and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

I.       An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

J.       An order awarding attorneys' fees and costs to Plaintiff and the Class/Sub-Classes; and

K.       An order providing for all other such equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 17, 2022

*/s/ H. James White (P56946)*

White Law PLLC
Attorney for Class Plaintiffs
2549 Jolly Road, Suite 340
Okemos, Michigan 48864
Ph.: (517) 316-1195
Fax: (517) 316-1197
W: www.whitelawpllc.com
E: jameswhite@whitelawpllc.com